UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

98 SEP 15 PM 1:54

U.S. DISTRICT COURT
N.D. OF ALABAMA

LOWELL GENE CHRISTIE,                    )
                                         )
        Plaintiff,                       )
                                         )
vs.                                      )   Civil Action No. CV 96-S-3069-NE
                                         )
THE CITY OF CULLMAN, ALABAMA,            )
and its council members: MAYOR           )
JACK SIDES, O.D. PARRIS, MARCUS          )
CLARK, JOHN KNIGHT, BUFORD               )
LOWERY and DAN GREEN their               )
assigns and successors in                )
office, individually and in              )
their official capacity;                 )
CULLMAN COUNTY, ALABAMA, and             )
the commissioners: NORMAN P.             )
TUCKER, DOUGLAS TERRY, RONALD            )
DILLASHAW, and KENNETH                   )
CULPEPPER; the Chief of Police           )
of Cullman, Alabama,                     )
individually and in their                )
official capacity,                       )
                                         )
        Defendants.                      )

ENTERED

SEP 1 5 1998

## MEMORANDUM OPINION

Plaintiff, Lowell Gene Christie, is a former employee of the Cullman County, Alabama road department. His employment was terminated on September 23, 1996. He claims those persons who shall be described herein as "the Cullman County defendants"[1] terminated his employment in retaliation for his efforts, among others, to organize a union among county employees.

---

[1] Christie asserts claims against Cullman County, Alabama and members of the Cullman County in their official and individual capacities. Those members are Norman P. Tucker, Douglas Terry, and Ronald Dillashaw.

In protest of the termination, Christie picketed outside the Cullman County Courthouse. An ordinance enacted by the City of Cullman required that any person desiring to parade or demonstrate on city streets and sidewalks obtain a permit before doing so. Christie complied with that ordinance, securing official permission to picket. Christie was arrested, however, when he allegedly violated the terms of his permit. Christie asserts that those persons who shall be described herein as "the City defendants"[2] violated rights secured by the First and Fourteenth Amendments to the United States Constitution.[3] (Complaint ¶ 1.)

This action is before the court on three motions for summary judgment. Christie moved for partial summary judgment against the City defendants, seeking a judgment declaring the city's parade ordinance unconstitutional, and declaring that these defendants violated his first amendment right to freedom of speech. In opposition, the City defendants contend their actions were constitutional. They move for summary judgment on all claims. Similarly, the Cullman County defendants move for summary judgment on all claims.

---

[2] Christie asserts claims against the City of Cullman and members of the Cullman City Council in their official and individual capacities. Those council members are Mayor Jack Sides, O.D. Parris, Marcus Clark, John Knight, Buford Lowery and Dan Green. He also asserts claims against Kenneth Culpepper, the Chief of Police of Cullman, Alabama.

[3] Christie further asserts state law claims for wrongful arrest, false imprisonment, and malicious prosecution. (Plaintiff's First Motion for Leave to Amend, Doc. No. 14.)

2

Upon consideration of pleadings, briefs, and evidentiary submissions, this court concludes each motion is due to be granted in part and denied in part.  The court's analysis will proceed in the following order.

                              I. SUMMARY JUDGMENT STANDARD
                                        II. FACTS

A.    Christie's Union Activities
B.    Christie's Termination
C.    Investigation Of Harassment Complaints Against Other County Personnel
D.    Christie's Picketing Activities
                                  III. DISCUSSION
A.    Christie's Motion For Partial Summary Judgment
      1.    Constitutionality of section 12-52
            a.    Christie's facial challenge to the ordinance
            b.    Christie's challenge to the ordinance as applied
      2.    Municipal authority
B.    The City Defendants' Motion For Summary Judgment
      1.    Claims against the City of Cullman
            a.    Claims under 42 U.S.C. § 1983
                  (1)   First Amendment claims
                  (2)   Fourteenth Amendment claims
            b.    State law claims
      2.    Claims against individual City defendants
            a.    Claims under 42 U.S.C. § 1983
                  (1)   Individual defendants in their official capacities
                  (2)   Individual defendants in their individual capacities
            b.    State law claims
                  (1)   Malicious prosecution
                  (2)   False arrest & imprisonment
C.    Cullman County Defendants' Motion For Summary Judgment
      1.    Whether Christie's speech is protected, and interests are outweighed
            a.    Whether Christie's speech involved a matter of "public
                  concern"
            b.    Whether Christie's interest in speaking outweighs the county's
                  legitimate interest in efficient public service
      2.    Whether Cullman County defendants are immune from suit
            a.    Cullman County
            b.    Whether individual defendants are entitled to qualified
                  immunity in their individual capacities
      3.    Whether Christie offered sufficient evidence that Cullman County
            defendants interfered with his right to protest
                                  IV. CONCLUSION

3

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(per curiam). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence

4

presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. at 2512.

5

## II. FACTS

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

### A. Christie's Union Activities

Lowell Gene Christie was employed by the Cullman County Road Department for approximately one and a half years, from April 1995 until September 1996. During that period, he twice applied for promotions, and was twice denied. Following the first denial in March of 1996, Christie presented grievances to: his supervisor, County Engineer Tommy Miller; the Cullman County Commission; and, the Cullman County Personnel Board. (Plaintiff's deposition at 126.) Each grievance, like each application for promotion, was rejected. (*Id.* at 126-27; Miller deposition at 9-10.)

Following the second denial, which occurred on an undisclosed date,[4] Christie joined a group attempting to form a union among county employees. (Plaintiff's deposition at 118-19.) In furtherance of that effort, Christie and a number of other county employees attended a meeting of the Cullman County Commission on August 12, 1996, during which Christie petitioned the commission for "recognition" of the nascent organization. (*Id.* at 121.) Commissioner Norman ("Pete") Tucker responded by suggesting that

---

[4] Christie does not identify the date on which he was denied the second promotion, and only contends "[i]t was after the first one." (Plaintiff's deposition at 127.)

6

Christie "needed to look for another job." (Id.)

## B. Christie's Termination

Christie posted notices of union meetings on a soft drink machine in the employee break room of the Cullman County Road Department. (Plaintiff's deposition at 146-47, 151.) On September 19, 1996, Christie observed the department's secretary, June Haynes, removing one of those signs and then relocating it to the wall of the break room. (Id. at 154-55.) Christie rebuked Haynes, instructing her to "leave her hands off our damn union signs." (Id. at 155.) Haynes explained that County Engineer Tommy Miller had ordered her to move the notice. Christie retorted: "Well, I don't care what Tommy Miller told you. ... leave my damn union signs alone." (Id. at 161.) Haynes said she did not appreciate Christie's language, but he replied: "I don't care what you appreciate. ... just leave our signs alone." (Id. at 163.)

As Ms. Haynes walked out of the break room, Christie referred to her, in the presence of other road department employees, as a "fat-assed bitch." (Id. at 163; Miller deposition at 16-17; Plaintiff's Evidentiary Response to Cullman County's Motion for Summary Judgment, Doc. No. 59, exhibit 3-G.)

The following day (Friday, September 20, 1996), Christie was called to a meeting with County Engineer Tommy Miller and Cullman County Commissioner Douglas Terry. (Id. at 168-69.) Christie tape-recorded the meeting and asked other "pro-union" employees to

7

attend, because he believed he was being "set-up."  (*Id.* at 169, 172.)  During the meeting, Christie was told that Miller had received complaints regarding the statements Christie made to and about June Haynes.  (*Id.* at 175.)  Christie was told his conduct was "unacceptable," and he was sent home for the day while a decision was made regarding disciplinary action.  (*Id.*)

The following Monday (September 23, 1996), Christie met with Tommy Miller and the Cullman County commissioners.  (*Id.* at 178.) Christie was fired.  (*Id.* at 180.)  The following excerpt from the "Employee Disciplinary Report" reflects the commissioners' stated reasons for termination:

> EMPLOYEE VERBALLY ABUSED A FELLOW EMPLOYEE, JUNE HAYNES, CALLING HER "A FAT-ASSED BITCH" IN THE PRESENCE OF OTHERS; THIS CONDUCT UNREASONABLY INTERFERING WITH HER JOB PERFORMANCE OR CREATING A WORK ENVIRONMENT THAT WAS INTIMIDATING, HOSTILE, OR OFFENSIVE TO A REASONABLE PERSON IN VIOLATION OF THE SEXUAL HARASSMENT POLICY PREVIOUSLY ADOPTED BY THE CULLMAN COUNTY COMMISSION. EMPLOYEE MADE ALLEGATIONS OF COMMISSIONERS' IMPROPER APPLICATION OF HANDBOOK PROVISIONS "AS IT SUITED THEM". EMPLOYEE MADE A COMMENT TO A COMMISSIONER TO THE EFFECT "HOW DO YOU GET AHEAD OUT AT THE ROAD DEPARTMENT, KISS SOMEBODY'S ASS?"  THE COMMISSION FINDS THESE STATEMENTS AND ACTIONS TO NOT ONLY VIOLATE THE RIGHTS OF FELLOW EMPLOYEE'S FREEDOM FROM VERBAL ABUSE, BUT FIND ALLEGATIONS OF IMPROPER HANDBOOK APPLICATION TO BE UNTRUE AND FIND EMPLOYEE'S COMMENTS TO BE DISRUPTIVE AND DESTRUCTIVE BY QUESTIONING THE INTEGRITY OF THE COMMISSION.  ABUSIVE LANGUAGE DIRECTED AGAINST A FEMALE EMPLOYEE COULD BE INTERPRETED AS SEXUAL HARASSMENT BY FOSTERING AN ENVIRONMENT THAT IS INTIMIDATING, HOSTILE AND OFFENSIVE, AND WILL NOT BE ALLOWED.  THE REASON FOR DISMISSAL IS THEREFORE CONSIDERED TO COME UNDER HANDBOOK SECTION IX.C.2(2O) — DISMISSAL FOR A GROUP TWO OFFENSE OF ABUSIVE LANGUAGE TOWARD A FELLOW EMPLOYEE AND ABUSIVE PUBLIC CRITICISM OF A COUNTY OFFICIAL, AND FOR VIOLATION OF SECTION IX.C.2(18).

8

(Plaintiff's Evidentiary Response to Cullman County's Motion for Summary Judgment, Doc. No. 59, exhibit 3-F.)   Later that day, during a public meeting of the Cullman County Commission, Christie denied the allegations contained in the employee disciplinary report and requested an appeal of his discharge.   (Plaintiff's deposition at 181-82.)

Christie filed a grievance with the Cullman County Personnel Board.   The Board conducted a hearing on October 10, 1996.   (*Id.* at 182.)   During the hearing, the county abandoned that portion of the disciplinary report which alleged Christie made derogatory comments about a county commissioner.   (Plaintiff's Evidentiary Response to Cullman County's Motion for Summary Judgment, Doc. No. 59, exhibit 2 at 21-22.)   Thus, it was the county's position that "the incident relative to Mr. Christie and a female employee would be the basis for the termination."   (*Id.* at 23.)

After listening to testimony and deliberating on the matter, the personnel board recommended that the county commission reinstate Christie.   The board listed its conclusions as follows:

1.   It is the unanimous opinion of the Board that sexual harassment has not been proved and has nothing to do with this case.

2.   If any "Group Two Offense" is involved in this case it would be number (20): "abusive personal conduct or language toward the public or fellow employees, or abusive public criticism of a superior or other county official".   There was some evidence presented which would support a conclusion that offense #20 was committed.   However, when the totality of the evidence is considered together,

9

> the Board believes that it is not clear that the employee was guilty of said offense. The evidence is unclear, contradictory, confusing and inconclusive. Therefore, the Board is unable to conclude that the employee is guilty of said offense from the evidence presented.

3. The Board does believe that the evidence shows some misconduct on the part of the employee and therefore the Board recommends that the employee not be paid for the time he has missed work since his dismissal. The Board recommends that this time be considered a temporary suspension and a warning against the use of improper language on the job in the future. The board specifically noted from uncontradicted testimony that the employee had not previously been warned about this kind of language and/or conduct. It is the opinion of the Board that a warning to the employee would have been appropriate before dismissing him.

4. In light of the above conclusions the Board recommends to the Cullman County Commission that the action of dismissal on September 23, 1996 be reversed and the employee be reinstated to his former job on Monday October 21, 1996, at the same rate of pay he was paid before he was dismissed.

(Plaintiff's Evidentiary Response to Cullman County's Motion for Summary Judgment, Doc. No. 59, exhibit 3-I.)

The Cullman County Commission rejected the personnel board's recommendation, however, and voted on October 28, 1996, to uphold the discharge of Lowell Gene Christie.[5] (Plaintiff's deposition at 185.)

---

[5] The exact vote count of the Cullman County Commission is a mystery of the record. The court assumes those commission members named as defendants voted to reject the personnel board's recommendation.

10

## C.    Investigation Of Harassment Complaints Against Other County Personnel

Christie argues that the stated basis for his termination was a pretext. He points to the situation of another county employee, Jimmie Wells, who also was accused of sexual harassment, but treated differently. Wells was the supervisor of the Cullman County Road Department's maintenance shop in 1995. At that time, County Engineer Tommy Miller was not "directly responsible for the direction of the [road department] employees." (Miller deposition at 37.) Even so, maintenance shop employee Bonnie Cosper addressed a letter to Miller and the Cullman County Commission on April 12, 1995, in which she accused Jimmie Wells of sexually harassing her and another employee, Anna Thomas.

Miller already knew of the allegations of harassment against Wells before April 12, 1995. With the first reports of harassment, he questioned "all of the other employees involved," each of whom (including Anna Thomas) denied any harassment. (*Id.* at 32.)

The complaints persisted, however, and Miller reported the allegations of harassment to the Cullman County Commission. (*Id.* at 35.) The commission never provided Miller with a response to those allegations. (*Id.* at 36.) Furthermore, "[t]he county commission did not ask for an investigation of those charges, and to [Miller's] knowledge there was never a determination that they

11

were in fact valid."[6] (*Id.* at 45.)

Jimmie Wells still works for the Cullman County Road Department, although he was transferred to the position of paving supervisor during the pendency of the sexual harassment investigation. (*Id.* at 24-25.)

## D. Christie's Picketing Activities

On the same day the Cullman County Commission rejected the recommendation of the personnel board, thereby upholding Christie's discharge, Christie decided to picket the courthouse. He hoped such demonstrative activity would generate public awareness of his situation, and, induce county citizens to contact the commissioners and persuade them to reconsider their decision. (Plaintiff's deposition at 32.)

Christie telephoned City of Cullman Police Chief Kenneth Culpepper on October 28, 1996, and asked whether a permit would be required to picket outside the courthouse. (*Id.* at 33.) Chief Culpepper said no permit was required if Christie picketed alone, but one would be required if other persons joined him. (*Id.*)

Section 12-52 of the Cullman City Code governs the issuance of permits for public demonstrations. It provides:

---

[6] Before signing the transcript of his deposition, Miller attempted to change his testimony to read "The County Commission did ask the Sheriff's Department for an investigation of those charges, and to my knowledge there was never a determination they were in fact valid." (*See* Plaintiff's Evidentiary Response to Cullman County's Motion for Summary Judgment, Doc. No. 59, exhibit 8.) That attempted change creates a conflict in the evidence, which must be resolved in a light most favorable to plaintiff when deciding Cullman County's motion for summary judgment.

12

**(a) Required.**  It shall be unlawful to promote, organize or hold or to assist in organizing or holding, or to take part or participate in, any parade or procession or other demonstration in the streets or other public ways of the city, unless a permit therefor has been secured from the city council.

**(b) Application; issuance.**  To secure such permit, written application shall be made to the city council, setting forth the hour and date, the probable number of persons, vehicles, and animals which will be engaged in such parade, procession or other demonstration, the purpose for which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or demonstration.  The city council shall grant a written permit for such parade, procession or demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused.  It shall be unlawful to use for such purposes at the hour and on the date requested, any other street or public way than those set out in the permit.

**(c) Funeral procession.**  This section shall not apply to funeral processions.

(Plaintiff's Brief in Support of Summary Judgment, Doc. No. 45, exhibit 10 (emphasis supplied).)

Christie appeared before the Cullman City Council on the evening of October 28, 1996, and requested a permit to protest his termination.  (*Id.* at 32, 34-35.)  Legal counsel for the city acknowledged Christie's right to do so, but voiced concern over potential problems for public safety. (City Defendants' Motion for Summary Judgment, Doc. No. 47, exhibit 2 at 5-6.)  Further, he noted the city council could not grant Christie permission to demonstrate on the grass surrounding the courthouse, because that

13

property belonged to the county. (*Id.* at 7.) Christie agreed to remain on the city's sidewalks. (*Id.*) He also agreed to limit the number of persons holding signs to four, and to refrain from picketing on election day. (*Id.* at 7-8.) Finally, he expressed his desire to demonstrate only during working hours, from 8:00 a.m. until 4:30 p.m. (*Id.* at 7.)

At the conclusion of the meeting, Cullman City Councilman Dan Green moved to "grant the permission to Mr. Christie to picket, depending on his meeting the requirements for the Police and the Mayor." (*Id.* at 11.) The council approved that motion unanimously. (*Id.*) The next day, Chief Culpepper prepared the permit, which read as follows:

> PERMISSION IS HEREBY GRANTED TO Lowell Gene Christie & supporters to picket the Cullman [County] Courthouse. For safety reasons, the following restrictions will be followed:
>
> 1. All picketing must take place on city sidewalks. The City can not grant permission to picket on County property.
>
> 2. No more than (4) four picketers may actively picket (carry placards) at any time.
>
> 3. Picketing will only be conducted between the hours of 9:00 a.m. [and] 2:00 p.m. This will allow courthouse workers to arrive and depart without interference.
>
> 4. Picketing will be limited to (4) days during the two week period between Monday, October 28th and Monday, November 11th. Picketers may choose any day during this span except Tuesday, November 5th which is Election Day. If picketers desire to picket beyond this time, they must appear before the Cullman City Council and repetition [sic].

14

5.    No sidewalks, doors, etc. may be blocked.

6.    No offensive, obscene or vulgar signs may be used.

7.    Any justifiable safety complaints filed with the
      Cullman Police Department because of picketing will
      result  in  the  immediate  termination  of  the
      picketing.

(Plaintiff's Motion for Partial Summary Judgment, Doc. No. 44,

exhibit 8 (emphasis supplied).)  Christie also was required to sign

a "Hold Harmless Agreement," agreeing to be "solely liable for any

damages caused by me (us)" on city property, and, acknowledging

that his permit could be revoked for "just cause."  (Plaintiff's

Motion for Partial Summary Judgment, Doc. No. 44, exhibit 7.)

On November 4, 1996, Christie picketed the courthouse beyond

the time limit specified in his permit.  He was demonstrating by

himself at approximately 3:00 p.m. when approached by a city police

officer.   (Plaintiff's deposition at 57.)   The officer informed

Christie that the police department had received complaints from

the courthouse, because Christie was picketing beyond 2:00 p.m.

(Id.)  Christie was asked to leave the area, but he refused.  (Id.

at 57-58.)

The officer left, but soon returned with Chief Culpepper.  The

Chief informed Christie that he would be arrested if he did not

leave.  Christie reminded Chief Culpepper of his prior statement

that no permit was required for a solitary picketer.  (Id.)  Chief

Culpepper responded that Christie was bound by the terms of his

15

permit, and that he would take Christie to jail if Christie did not

leave. (See id. at 58-59.) Christie replied:

> Well, I guess I'll have to go to jail. ... If I just
> pack up and leave, it's going to be my word against you
> two's that you are violating my constitutional rights.
> ... You can take me to jail ... [b]ecause you told me
> that I didn't have to have no permit.

(Id. at 59.) Chief Culpepper then made Christie remove all the

signs from his truck, searched him in front of the courthouse, and

took him to jail. (Id.) The criminal charges against Christie

remain pending.

### III. DISCUSSION

### A. Christie's Motion For Partial Summary Judgment

Christie seeks partial summary judgment against the City

defendants, and asks this court to enter a judgment

> declaring [1] that City Ordinance Sec. 12-52 is
> unconstitutional on its face or as applied to picketing
> the object of which has a First Amendment component, that
> as a matter of law the plaintiff's arrest and prosecution
> for solo picketing violated his First Amendment rights,
> [2] that as a matter of law the City lacks the authority
> to require a permit in order to picket at a traditional
> public forum and that as a matter of law the City lacked
> the authority to limit the time of picketing or to place
> other prior restraints on First Amendment rights.

(Plaintiff's Motion for Partial Summary Judgment, Doc. No. 44, at

2.)

### 1. Constitutionality of section 12-52

#### a. Christie's facial challenge to the ordinance

Federal courts generally will entertain constitutional

challenges to statutes only as they are applied to individual

16

citizens. *Nichols v. Village of Pelham Manor*, 974 F. Supp. 243, 250 (S.D.N.Y. 1997). Even so, "[i]t is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable."[7]   *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129, 112 S. Ct. 2395, 2400-01, 120 L. Ed.2d 101 (1992). Such a facial challenge is permissible where a law creates a prior restraint on first amendment rights, and delegates standardless or overly broad discretionary power to local decisionmakers. *Id.*, 112 S. Ct. at 2401; *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13, 93 S. Ct. 2908, 2916, 37 L. Ed. 2d 830 (1973).

Christie contends that Cullman City Code § 12-52 is facially invalid because it confers overly broad discretion to the city council. A party challenging an ordinance for facial invalidity must establish that the overbreadth is real and substantial. *Id.* at 615, 93 S. Ct. at 2918. The challenging party may succeed by establishing that the ordinance lacks "narrow, objective, and definite standards to guide the licensing authority." *Forsyth County*, 505 U.S. at 131, 112 S. Ct. at 2401 (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51, 89 S. Ct. 935, 938, 939, 22 L. Ed. 2d 162 (1969)).

---

[7] In fact, in a facial challenge, the facts of the challenging party's case are irrelevant. *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 674 n.4 (11th Cir. 1984).

17

If the challenge is sustained, all enforcement under the ordinance is forbidden unless and until a limiting construction or partial invalidation removes the improper restriction or threat on free speech. *Broadrick v. Oklahoma*, 413 U.S. at 613, 93 S. Ct. at 2916.

Even if the ordinance is overbroad on its face, an authoritative interpretation may narrow the ordinance sufficiently to save it from the challenge. *See Poulos v. State of New Hampshire*, 345 U.S. 395, 402, 73 S. Ct. 760, 765, 97 L. Ed. 1105 (1953) (considering interpretation of city licensing ordinance by highest court in state "as though written into the ordinance itself"); *Cox v. State of New Hampshire*, 312 U.S. 569, 576, 61 S. Ct. 762, 766, 85 L. Ed. 1049 (1941).

Although the court would like to float this case along the easily navigable waters of the overbreadth doctrine, precedent has charted a different course. The Alabama Supreme Court has lent a narrowing interpretation to a virtually identical ordinance from the City of Birmingham. *See Shuttlesworth v. City of Birmingham*, 206 So. 2d 348 (Ala. 1967). For ease of comparison, the two ordinances are set forth below,[8] with emphasis applied to textual differences:

---

[8] The text of the Birmingham Ordinance is taken from Shuttlesworth v. City of Birmingham, 394 U.S. 147, 149-50, 89 S. Ct. 935, 937-8, 22 L. Ed. 2d 162 (1969), while the language of the City of Cullman ordinance at issue herein is taken from plaintiff's exhibit 10 in support of his motion for summary judgment.

18

| BIRMINGHAM ORDINANCE | CULLMAN ORDINANCE |
|---|---|
| It shall be unlawful to **organize** or hold, or to assist in organizing or holding, or to take part or participate in, any parade or procession or other **public** demonstration **on** the streets or other public ways of the city, unless a permit **therefore** [sic] has been secured from the **commission**. | **(a) Required.**  It shall be unlawful to **promote, organize** or hold or to assist in organizing or holding, or to take part or participate in, any parade or procession or other [] demonstration **in** the streets or other public ways of the city, unless a permit **therefor** has been secured from the **city council**. |
| To secure such permit, written application shall be made to the **commission**, setting forth the [] probable number of persons, vehicles and animals which will be engaged in such parade, procession or other **public** demonstration, the purpose **of** which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or **other public** demonstration. The **commission** shall grant a written permit for such parade, procession or **other public** demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused. It shall be unlawful to use for such purposes [] any other streets or public **ways** than those set out in said permit. | **(b) Application; issuance.**  To secure such permit, written application shall be made to the **city council**, setting forth **the hour and date,** the probable number of persons, vehicles, and animals which will be engaged in such parade, procession or other [] demonstration, the purpose **for** which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or [] demonstration. The **city council** shall grant a written permit for such parade, procession or [] demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public **welfare**, peace, safety, health, decency, good order, morals or convenience require that it be refused.  It shall be unlawful to use for such purposes **at the hour and on the date requested,** any other street or public **way** than those set out in the permit. |
| **The two preceding paragraphs, however,** shall not apply to funeral processions. | **(c) Funeral procession.  This section** shall not apply to funeral processions. |

As the foregoing dual column display makes clear, the Birmingham ordinance construed by the Supreme Court of Alabama in *Shuttlesworth* and the Cullman ordinance at issue before this court

19

are virtually identical.[9]

The Supreme Court of Alabama construed the ordinance in a way
designed to uphold the ordinance in the face of a similar
challenge:

> We also hold that under [the Birmingham ordinance] the
> Commission is without authority to act in an arbitrary
> manner or with unfettered discretion in regard to the
> issuance of permits. Its discretion must be exercised
> with uniformity of method of treatment upon the facts of
> each application, free from improper or inappropriate
> considerations and from unfair discrimination.    A
> systematic, consistent and just order of treatment with
> reference to the convenience of public use of the streets
> and sidewalks must be followed. Applications for permits
> to parade must be granted if, after an investigation it
> is found that the convenience of the public in the use of
> the streets or sidewalks would not thereby be unduly
> disturbed.

206 So. 2d at 352 (emphasis supplied).

The interpretation of Alabama's highest court must be read "as
though written into the ordinance itself." *Cox*, 312 U.S. at 576,
61 S. Ct. at 766. The United States Supreme Court, interpreting
the Birmingham ordinance without reference to the narrow
construction given as that case was pending, found the ordinance
overly broad and unconstitutional. 394 U.S. 147, 150-51, 89 S. Ct.
935, 938, 22 L. Ed. 2d 162 (1969). The Court said:

> This ordinance as it was written, therefore, fell
> squarely within the ambit of the many decisions of this
> Court over the last 30 years, holding that a law
> subjecting the exercise of First Amendment freedoms to

---

[9] The court acknowledged in *Shuttlesworth* that the term "commission" as
used in the Birmingham ordinance refers to the governing body of the city.
*Shuttlesworth*, 206 So. 2d at 349. The Cullman ordinance uses the term "city
council," also in reference to the governing body of the city.

20

the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.

*Id.,* 89 S. Ct. at 938 (emphasis supplied). Nevertheless, the Supreme Court described the construction of the ordinance authored by Alabama's highest court as "a commendable effort to give the legislation 'a field of operation within constitutional limits' ... [that] [w]e may assume ... was successful, and that the ordinance as authoritatively construed [by the Supreme Court of Alabama] would pass constitutional muster." *Id.* at 155, 89 S. Ct. at 941 (emphasis supplied).

Moreover, the Alabama Supreme Court based its construction of the Birmingham ordinance on the New Hampshire Supreme Court's narrowing construction of a "parade license" ordinance in the face of a similar challenge. *Shuttlesworth*, 206 So. 2d at 350-52; *see Cox*, 312 U.S. at 576, 61 S. Ct. at 766 (describing the state court's holding "that the licensing board was not vested with 'uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination'"). The United States Supreme Court accepted the New Hampshire court's construction and found the ordinance constitutional:

If a municipality has the authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets. We find it impossible to say that the

21

> limited authority conferred by the licensing provisions
> of the statute in question as thus construed by the state
> court contravened any constitutional right.

*Id.* at 576, 61 S. Ct. at 766.

This court finds the Alabama Supreme Court's interpretation of the City of Birmingham's ordinance in *Shuttlesworth* binding as to the nearly exact replica in the form of Cullman City Code § 12-52.[10] The court, therefore, holds that the ordinance has sufficient standards to guide the city council and, thus, survive a facial challenge on the grounds that the breadth of discretion granted to the licensing authority is overly broad. If the city council acts in a way incompatible with the Alabama Supreme Court's construction of the ordinance, whatever overbreadth may result "should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick*, 413 U.S. at 615-16, 93 S. Ct. at 2918; *see also Shuttlesworth*, 394 U.S. at 155, 89 S. Ct. at 941 (quoting *Cox*, 312 U.S. at 577, 61 S. Ct. at 766);

---

[10] The court notes, but does not rely on the fact, that in the context of regulations on conduct rather than on "pure speech," the regulations on acknowledged political activity have been subject to "less exacting overbreadth scrutiny." *Broadrick*, 413 U.S. at 616, 614, 93 S. Ct. at 2918, 2917.

The court notes also that in analyzing facial challenges to ordinances, the Supreme Court, as in *Forsyth County*, has looked to the local authority's constructions and implementations of the ordinance. *See, e.g., Forsyth County*, 505 U.S. at 131, 112 S. Ct. at 2402. In *Forsyth County* and the cases cited therein, however, no judicial interpretation governed the administration of the ordinances at issue, *i.e.* there was no narrowing construction by a court. Therefore, the Court looked to the local authority's constructions and implementations of the ordinance to determine if there were "any narrowly drawn, reasonable and definite standards ... guiding the hand of [the local authority]." *Id.* at 132-33, 112 S. Ct. at 2402-03. In the instant case, the local authority's constructions and implementations of the ordinance are inapposite to the facial challenge, given the narrowing construction by the Alabama Supreme Court. Instead, any issues regarding the city council's application of the ordinance will arise in the challenge to the ordinance "as applied."

22

*Shuttlesworth*, 206 So. 2d at 548.    This portion of Christie's
motion, therefore, is due to be denied.

### b.   Christie's challenge to the ordinance as applied

In essence, Christie claims that, as applied to him, Cullman
City Code § 12-52 operated as an invalid prior restraint on speech,
in violation of the First Amendment to the United States
Constitution. As the Supreme Court defines it, "[t]he term 'prior
restraint' describes orders forbidding certain communications that
are issued before the communications occur." *Alexander v. United
States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771, 125 L. Ed. 2d
441 (1993). A "heavy presumption" exists against the validity of
prior restraints. *Forsyth County*, 505 U.S. at 130, 112 S. Ct. at
2401.

The Cullman ordinance requires a permit before any parade,
procession, or other demonstration may occur in the streets or
public ways of that city. In other words, the exercise of first
amendment rights are conditioned upon the granting of a permit.
This court agrees that § 12-52 is a prior restraint.    *See*
*Shuttlesworth*, 394 U.S. at 150-51, 89 S. Ct. at 938, 939 (declaring
virtually identical ordinance a prior restraint); *see also Forsyth
County*, 505 U.S. at 130, 112 S. Ct. at 2401 (finding ordinance
requiring a permit and fee before authorizing public speaking,
parades, or assemblies to be a prior restraint); *Community for
Creative Non-Violence v. Turner*, 893 F.2d 1387, 1389-90 (D.C. Cir.

23

1990)(finding regulation requiring permit to engage in free speech activities to be a prior restraint).

In reviewing prior restraints, federal courts attempt to balance legitimate government functions with the First Amendment rights these functions inhibit. Municipalities are implicated in this balance:

> Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action. It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the amendment.

*Lovell v. City of Griffen*, 303 U.S. 444, 450, 58 S. Ct. 666, 668, 82 L. Ed. 949 (1938) (citations omitted). The Supreme Court, however, also has recognized the need to allow municipal governments to infringe upon these individual rights when acting in the public interest:

> Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.

*Cox v. State of New Hampshire*, 312 U.S. 569, 574, 61 S. Ct. 762, 765, 85 L. Ed. 1049 (1941).

When a municipality seeks to regulate the conduct associated

24

with expression—that is, to regulate in a content-neutral manner—the municipality must satisfy the so-called time, place, and manner test. *International Caucus of Labor Committees v. City of Montgomery*, 111 F.3d 1548, 1550 (11th Cir. 1997) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 954-55, 74 L. Ed. 2d 794 (1983)). This standard varies, depending on whether the regulated activity takes place in a public forum. When regulating conduct in a public forum, a city may impose reasonable restrictions on the time, place, and manner of protected speech. These restrictions must satisfy a three part inquiry. They must (1) be content neutral, (2) be narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information. *International Caucus*, 111 F.3d at 1551 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753-54, 105 L. Ed. 2d 661 (1989)).

The Supreme Court holds that "picketing plainly involves expressive conduct within the protection of the First Amendment." *Police Department v. Mosley*, 408 U.S. 92, 99, 92 S. Ct. 2286, 2292, 33 L. Ed. 2d 212 (1972). Sidewalks are traditional public fora, *International Caucus*, 111 F.3d at 1548 (citing *Frisby v. Shultz*, 487 U.S. 474, 480, 108 S. Ct. 2495, 2500, 101 L. Ed. 2d 420 (1988), including those outside courthouses, *see United States v. Grace*, 461 U.S. 171, 180, 103 S. Ct. 1702, 1708, 75 L. Ed. 2d 736 (1983).

25

Christie argues that the application of the ordinance fails the second and third prongs of the time, place, and manner test: that is, the ordinance is not narrowly tailored to serve a significant governmental interest, and does not leave open ample alternative channels for communication.[11]

A content-neutral ordinance fails to satisfy the narrowly tailored requirement if it conditions the expressive activity on a licensing procedure, over which city officials have sole discretion. *See Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 673-75 (11th Cir. 1984). The discretion need not be so broad as to deny the licenses outright, but discretion to infringe significantly upon the exercise of first amendment rights may render a city's policy of administering an ordinance overly broad, and thus in violation of the narrowly tailored requirement.

For example, in *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S. Ct. 2395, 120 L. Ed. 2d 101, the Supreme Court was presented with an ordinance requiring demonstrators to pay a fee to defray the county's costs for protecting demonstrators and onlookers. The ordinance arguably gave the county administrator no discretion to reduce or waive the fee. 505 U.S. at 131 n.9, 112 S. Ct. at 2402 n.9.[12] The evidence demonstrated, however, that "the

---

[11] The court finds no genuine issue of material fact to dispute that the City defendants applied the ordinance in a content-neutral manner.

[12] *Forsyth County* involved a facial challenge, but the Court considered the ordinance as applied because no authoritative interpretation had established any narrow, guiding standards.

26

administrator based the fee on his own judgment of what would be reasonable." *Id.* at 132, 112 S. Ct. at 2402. The Court found the ordinance unconstitutional:

> The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees. The First Amendment prohibits the vesting of such unbridled discretion in a government official.

*Id.* at 132-33, 112 S. Ct. at 2402-03 (footnotes and citations omitted).

In *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666 (11th Cir. 1984), the Eleventh Circuit considered whether a city licensing scheme for selling newspapers, *via* newsracks situated in public places, was narrowly tailored. In this analysis, the court stated that a content-neutral licensing scheme according city officials the discretion to deny permits is unconstitutional if no procedural safeguards are available to guard against censorship. 734 F.2d at 675 (citing *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S. Ct. 734, 739, 13 L. Ed. 2d 649, 654 (1965); *Fernandes v. Limmer*, 663 F.2d 619, 628 (5th Cir. Unit A 1981)); *see also Redner v. Dean*, 29 F.3d 1495, 1500-02 (11th Cir. 1994) (listing and discussing two procedural safeguards necessary for licensing ordinance in issue: specified brief time limits on the decisionmaker and prompt judicial review). The court listed two such safeguards: (1) requiring the licensor to act upon an

27

application within a specified, brief period of time; and (2)
granting applicants prompt judicial review of licensing decisions.
Neither safeguard was available in the ordinance at issue.    The
court held the ordinance unconstitutional because it granted  broad
licensing discretion without adequate safeguards to ensure against
abuse of that discretion.   *Id.* at 676.

    The Supreme Court faced a similar ordinance that granted a
mayor discretion to deny an application for a permit to place
newsracks on public property in *City of Lakewood v. Plain Dealer
Publishing Co.*, 486 U.S. 750, 108 S. Ct. 2138, 100 L. Ed. 2d 771
(1988).   The ordinance also allowed the mayor "to condition the
permit on any additional terms he deemed 'necessary and
reasonable.'"   486 U.S. at 772, 108 S. Ct. at 2152.  The Court took
no comfort in the availability of judicial review where the review
came only after the mayor and city council had denied the permit.
The Court noted that no provision required timely action by the
city officials and, therefore, an application could "languish
indefinitely" before the city acted upon it.   *Id.* at 771, 108 S.
Ct. at 2151; *see also Cantwell v. Connecticut*, 310 U.S. 296, 306,
60 S. Ct. 900, 904, 84 L. Ed. 1213 (1940) ("[T]he availability of
a judicial remedy for abuses in the system of licensing still
leaves that system one of previous restraint which, in the field of
free speech and press, we have held inadmissible.")   The Court
found the terms granting the mayor this broad discretion

28

unconstitutional. *Id.*, 108 S. Ct. at 2151.

Although this court found sufficiently narrow guidelines in the ordinance as interpreted,[13] Christie's challenge to the ordinance as the City defendants applied it to him raises the issue of whether § 12-52 has been administered in a manner contrary to the construction placed upon it by the Alabama Supreme Court. *See Shuttlesworth*, 394 U.S. at 156, 89 S. Ct. at 942 (quoting *Cox*, 312 U.S. at 577, 61 S. Ct. at 766); *see also Shuttlesworth*, 206 So. 2d at 353 (repeating same proposition). The City of Cullman's policy for issuing parade permits suffers from the same deficiencies as those discussed above. The transcript of the Cullman City Council meeting during which plaintiff requested a parade permit demonstrates that the council granted unbridled discretion to the mayor and chief of police:

> MAYOR SIDES: Why don't you [Mr. Christie] put all that in writing, and get it to us. You all [city council] pass it on the condition that we get all this information in writing and signed by him.
>
> MR. KNIGHT: Okay.
>
> CHIEF CULPEPPER: We — we've worked with other groups that have protested different things, you know. I believe that we —
>
> MR. KNIGHT: You've got to put something together, and we'll pass it on those conditions.
>
> CHIEF CULPEPPER: I believe we can work with him to make sure they'll remain safe and come in compliance of the rules as we have set forth for other parties in

---

[13] *See* Part III.A.1.a *supra*.

29

similar circumstances.

   MR. CHRISTIE: Could I get with Mr. Culpepper, there, and work out the paperwork, and that would be suitable for you all?

   MR. KNIGHT: I believe most anything [Police Chief] Kenny [Culpepper] will come up with will be suitable for us; so Chief Culpepper —

   MR. GREEN: I move we grant the permission to Mr. Christie to picket, <u>depending on him meeting the requirements for the Police and the Mayor</u>.

   MR. PARRIS: I'll second it.

   MR. KNIGHT: The motion of Mr. Green, seconded by Mr. Parris. Is there any other discussion on this motion?

   THE COUNCIL: (No response.)

   MR. KNIGHT: All in favor, say, "Aye."

   THE COUNCIL: "Aye."

   MR. KNIGHT: All opposed, "No."

   THE COUNCIL: (No response.)

   MR. KNIGHT: So carried.

   MR. CHRISTIE: Thank you.

(City Defendants' Motion for Summary Judgment, Doc. No. 47, exhibit 2 at 10-11 (emphasis supplied).)

   Thus, Christie's right to engage in expressive conduct protected by the First Amendment was conditioned upon "meeting the [unspecified] requirements for the Police and the Mayor." At the meeting, the parties did consider the impact Christie's picketing would have on public safety. (City Defendants' Motion for Summary Judgment, Doc. No. 47, exhibit 2 at 5-6.) Ultimately, however, no

30

definitive, objective standards were established to guide Mayor Sides and Chief Culpepper as they formulated the permit restrictions after the meeting. *See Forsyth County,* 505 U.S. at 133, 112 S. Ct. at 2403.

Furthermore, no procedural safeguards were available to check the exercise of discretion accorded the mayor and chief by the city council. Although Christie may have been entitled to reappear before the council, no provision of the ordinance or policy of implementation forced the council to act within a specified time. Nor does evidence suggest the decisions restricting Christie's expressive activity were subject to meaningful judicial review. Nothing in the text of the ordinance, and nothing in its application by the council, prevented the mayor and chief of police from encouraging some views, or discouraging others, through arbitrary application of picketing restrictions. Even if there were such a limiting provision, the review would have been subject only to the same unchecked municipal authority, as no avenue for effective judicial review was provided.[14] *City of Lakewood,* 486

---

[14] The absence of prompt judicial review is a significant distinction in this case, involving a permit issued by a city council. In the instant case, according to defendants, plaintiff violated the terms of his permit. Plaintiff also failed to seek review before the city council of the permit issued by the city council. In cases such as *Walker v. City of Birmingham,* 388 U.S. 307, 87 S. Ct. 1824, 87 L. Ed. 2d (1967), in which the defendants were precluded from challenging the constitutionality of the underlying ordinance, plaintiffs did not attempt to have the temporary injunction restraining them from demonstrating without a permit (required by the City of Birmingham's ordinance) dissolved or modified. Rather, defendants deliberately violated the state court's injunction with the expectation of going to jail. In *Walker,* the Court said that the way for plaintiffs to raise their objections to the ordinance and to the injunction were via application to the Alabama courts. 388 U.S. at 317-18, 87 S. Ct. at 1830-31.

31

U.S. at 771, 108 S. Ct. at 2151; *see also Cantwell,* 310 U.S. at 306, 60 S. Ct. at 904. Although the First Amendment prohibits the vesting of such unbridled discretion in Mayor Sides and Chief Culpepper, in this challenge to the ordinance as applied the court must consider all facts relevant to Christie's case.

The City defendants argue that Christie waived his First Amendment rights by participating in the formulation of the terms of his permit: "How can be [*sic*] now be heard to complain that the terms about which he knowingly, voluntarily and intelligently formulated are constitutionally infirm?"    (City Defendants' Response to Plaintiff's Motion for Partial Summary Judgment, Doc. No. 58, at 5.) Furthermore, defendants assert that Christie could have reappeared before the council to seek an extension of his permit if he were unhappy with the restrictions. (City Defendants' Memorandum Brief in support of Motion for Summary Judgment at 5.)

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Finch v. Vaughn,* 67 F.3d 909, 914 (11th Cir. 1995). Where the ultimate effect of sustaining a claim of waiver would be an imposition on the freedom of speech, the waiver must be supported by clear and convincing evidence. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S. Ct. 1975, 1986, 18 L. Ed. 2d 1094 (1967).

Christie consented to some of the limitations imposed by the

32

.

permit.[15] He contends, however, that his arrest did not implicate the permit. Instead, Christie argues, he relied upon his initial telephone conversation with Chief Culpepper, during which the Chief told Christie he would not need a permit if he picketed alone. Christie was picketing alone when arrested. He was, however, also picketing beyond the time limitation in the permit.

For purposes of this analysis, the court assumes that Christie agreed to the restrictions in the permit. Given the unbridled discretion openly granted to Chief Culpepper, any reliance by Christie on the chief's prior statements was reasonable. In the face of this alleged reliance, the City defendants have offered no clear and convincing evidence that Christie's participation in the council meeting or thereafter amounted to a knowing, intelligent waiver of his apparent right to picket individually without a permit.

Christie did not waive his First Amendment right with regard to picketing individually without a permit. His expressive activity led to an arrest under an ordinance that, as administered, granted unbridled, unchecked discretion to Chief Culpepper. The arrest under this ordinance as applied "unwarrantedly abridged" Christie's right to free speech secured by the First Amendment of the United States Constitution. *Shuttlesworth*, 394 U.S. at 155, 89

---

[15] Whether the permit accurately reflected the restrictions agreed upon at the meeting is in dispute. (Defendants' brief in support of motion for summary judgment at 5.)

33

S. Ct. at 941 (quoting *Cox*, 312 U.S. at 574, 61 S. Ct. at 765). This court therefore holds Cullman City Code § 12-52 unconstitutional as it was applied to Lowell Gene Christie.

Christie is entitled to summary judgment declaring Cullman City Code § 12-52 unconstitutional as it was applied to him and, thus, that his arrest and prosecution under the terms of that ordinance violated his First Amendment rights. As to this claim, Christie's motion is due to be granted.

## 2. Municipal authority

Christie seeks a declaratory judgment "that as a matter of law the City lacks the authority to require a permit in order to picket at a traditional public forum and that as a matter of law the City lacked the authority to limit the time of picketing or to place other prior restraints on First Amendment rights." (Plaintiff's Motion for Partial Summary Judgment, Doc. No. 44, at 2.) The City of Cullman does possess such authority in the first instance, so long as it does not grant overly broad discretion to the licensing officials. A municipality may apply reasonable time, place, and manner restrictions that are narrowly tailored to serve a significant governmental interest, while leaving open ample alternatives for communication. *See Forsyth County*, 505 U.S. at 130, 112 S. Ct. at 2401; *see also* Part III.A.1 *supra*, and the cases cited therein. This claim is not well founded.

34

## B.  The City Defendants' Motion For Summary Judgment

### 1.  Claims against the City of Cullman

#### a.  Claims under 42 U.S.C. § 1983

##### (1)  First Amendment claims

The City defendants argue that neither Cullman City Code § 12-52, nor their application of it, violated Christie's First Amendment rights.[16] This court found that Christie has established such a violation in the application of § 12-52 by the City defendants.[17] Thus, this portion of the City defendants' motion is due to be denied.

##### (2)  Fourteenth Amendment claims

Christie fails to allege any specific claim under the Fourteenth Amendment. Given the liberal rule of notice pleading, see generally Wallace v. Montgomery, 956 F. Supp. 965, 978 (M.D. Ala. 1996), and Christie's other allegations, however, the court will consider this reference to the Fourteenth Amendment, as defendants do, as alleging a § 1983 false imprisonment claim.[18]  See

---

[16] The City of Cullman does not contest that it may face § 1983 municipal liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), for the ordinance at issue or its application. The court considers the county's challenge on this basis in Part III.C.2.a infra.

[17] See Part III.A.1.b supra.

[18] It is likely that plaintiff referred to the Fourteenth Amendment in his complaint, only because "the [First] Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment." 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489 n.1, 116 S.Ct. 1495, 1501 n.1, 134 L.Ed.2d 711 (1996). The introduction to plaintiff's complaint states "[t]he lawsuit seeks. to vindicate rights protected by the First and Fourteenth Amendments to the Constitution of the United States and by the Constitution of the State of Alabama." (Amended complaint, Doc. No. 14, at 1-2.) No further reference is

35

*Ortega v. Christian,* 85 F.3d 1521, 1526 (11th Cir. 1996) ("A false imprisonment claim under section 1983 is based on the protection of the Fourteenth Amendment against deprivations of liberty without due process of law.") Thus, the resolution of this § 1983 claim is determined, in the first instance, on the success of Christie's state law false imprisonment claim discussed below. *See Douthit v. Jones,* 619 F.2d 527, 532 (5th Cir. 1980).

### b.  State law claims

Christie alleges claims of "wrongful arrest, malicious prosecution, and false arrest." (Motion for leave to amend, Doc. No. 14.) Defendants first contend that a malicious prosecution action does not lie against the City of Cullman, because a municipality cannot act with malice. Defendants properly rely on *Franklin v. City of Huntsville,* 670 So. 2d 848 (Ala. 1995), and this portion of defendants' motion is due to be granted.

Municipalities can face liability, however, for actions alleging false arrest and false imprisonment based on negligence of a city employee acting within the scope of his employment. *Franklin v. City of Huntsville,* 670 So. 2d 848, 852 (Ala. 1995).

---

made to the Fourteenth Amendment.

   A review of plaintiff's complaint demonstrates that he seeks damages from the city only for infringement of his first amendment right to "peacefully picket." (*See* amended complaint, Doc. No. 14, ¶ 5 at 6.) Liberty interests and due process rights secured by the Fourteenth Amendment are mentioned nowhere.

   Even so, Christie attempts to assert claims for infringement of due process and liberty interests in his response to the City of Cullman's Summary Judgment Motion. (*See* Doc. No. 60 at 6.) Those claims are unsupported by his complaint, and may be subject to dismissal for failure to state a claim upon which relief may be granted. The court reserves this determination, as its resolution of the matter renders this issue moot.

In arresting Christie, Chief Culpepper was acting within the scope of his employment. The issue then becomes whether the Chief acted negligently. *See* Ala. Code § 11-47-190 (1975).

Even making all inferences from the evidence in favor of Christie, this court finds that Chief Culpepper was not negligent in arresting Christie under the duly enacted ordinance. *Cf. Johnson v. Calhoun County,* 665 So. 2d 201, 204 (Ala. 1995) (finding no negligence or other § 11-47-190 violation for officers' arrest of plaintiff pursuant to a valid arrest warrant). Chief Culpepper acted on his reasonable belief that after acquiring a permit for picketing, Christie was bound by its terms. (Plaintiff's deposition at 58-59.) Paragraph 3 of the permit limits the time frame of picketing, and does not expressly distinguish individual picketing: "Picketing will be conducted between the hours of 9:00 a.m. 2:00 p.m." (*See* Complaint exhibit 4.) Chief Culpepper reasonably believed the time restrictions applied to any picketing by Christie, individual or otherwise. Moreover, he had probable cause to arrest Christie. *See Couch v. City of Sheffield,* 708 So. 2d 144, 155-56 (Ala. 1998) (finding arresting officer with probable cause immune under Ala. Code § 6-5-338 (1975), and stating that probable cause is established by an <u>objective</u> standard based on reasonable grounds for belief of guilt, which is satisfied by "[o]nly a probability, and not a prima facie showing, of criminal activity") (citations omitted)). Chief Culpepper advised Christie

37

that he was, allegedly, in violation of the permit. Culpepper also gave Christie the choice of complying with the time restriction listed in the permit or facing arrest. The court finds Chief Culpepper did not act negligently and, therefore, this portion of the City defendants' motion is due to be granted.

   **2.   Claims against individual City defendants**

   **a.   Claims under 42 U.S.C. § 1983**

         **(1)   Individual   defendants   in   their   official
                capacities**

   The claims against the individual City defendants in their official capacities are, in essence, claims against the City of Cullman. *See Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985). The Eleventh Circuit has held:

      Because suits against a municipal officer sued in
      his   official   capacity   and   direct   suits   against
      municipalities are functionally equivalent, there no
      longer exists a need to bring official-capacity actions
      against   local   government   officials,   because   local
      government units can be sued directly. ... To keep both
      the City and the officers sued in their official capacity
      as defendants in this case would have been redundant and
      possibly confusing to the jury.

*Busby v. City of Orlando*, *supra* at 776. Therefore, because the City of Cullman is a named party, the claims against defendants Mayor Jack Sides, O.D. Parris, Marcus Clark, John Knight, Buford Lowery, and Dan Green, and Kenneth Culpepper in their official capacities are due to be dismissed.

38

### (2) Individual defendants in their individual capacities

In response to the claims alleged against them in their individual capacities, the individual City defendants claim entitlement to qualified immunity for the performance of their discretionary functions at the municipal level. In an *en banc* opinion delivered in *Lassiter v. Alabama A & M University*, 28 F.3d 1146 (1994), the Eleventh Circuit discussed the bounds of qualified immunity:

> Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known."
>
> . . .
>
> Unless a government agent's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.

*Lassiter,* 28 F.3d at 1149 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed.2d 396 (1982)). The qualified immunity defense to § 1983 actions extends to municipal officials. *See Hardin v. Hayes,* 957 F.2d 845, 849 (11th Cir. 1992). The Eleventh Circuit has established a two-part, objective test for determining whether a governmental official successfully may assert this defense:

> 1. The defendant public official must first prove that "he was acting within the scope of his discretionary

39

authority when the alleged wrongful acts occurred."

> 2. Once the defendant public official satisfies his burden of moving forth with the evidence, the burden shifts to the plaintiff to show the lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional laws."

*Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)).

Qualified immunity serves as a defense from <u>suit</u>, that is, from the burdens of litigation, not simply a defense from <u>liability</u>. *Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996). Thus, this court recognizes that "qualified immunity questions should be resolved at the earliest possible stage of litigation," *Anderson v. Creighton*, 483 U.S. 635, 646 n.6, 107 S. Ct. 3034, 3042 n.6, 97 L. Ed. 2d 523 (1987), and that it is appropriate for the court to decide at this stage the threshold immunity question of whether the applicable law was clearly established at the time of the City defendants' actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed.2d 396 (1982).

A plaintiff's burden to overcome this affirmative defense is high, such that plaintiffs will pierce this shield only in "exceptional cases." *Lassiter*, 28 F.3d at 1149. Nevertheless, upon initial review of the instant case, Christie appeared to have established that the individual City defendants violated his First

Amendment rights, as those rights had been clearly established by the Alabama Supreme Court in its interpretation of Birmingham's nearly identical ordinance in *Shuttlesworth.* After *Shuttlesworth,* the only way Cullman City Code § 12-52 could be deemed innocuous to the First Amendment was if it were applied within the confines of the Alabama Supreme Court's construction.

Given the two *Shuttlesworth* opinions, in which the United States Supreme Court and the Alabama Supreme Court, respectively, ruled on an ordinance virtually identical the ordinance the city defendants applied in the instant case, defendants were not forced to "be creative or imaginative in drawing analogies." *Lassiter,* 28 F.3d at 1150. This guidance notwithstanding, defendants administered the ordinance in a manner such that city officials had unfettered discretion subject to no procedural safeguards, in violation of the law of the *Shuttlesworth* opinions.

This court agrees that the law governing the City defendants' conduct was clearly established. Ordinarily, the immunity defense should fail if the law was clearly established. *Harlow,* 457 U.S. at 818-19, 102 S. Ct. at 2738. Upon further review, however, and mindful of the Eleventh Circuit's admonition to "think long and hard before stripping defendants of immunity," *Lassiter,* 28 F.3d at 1149, the court finds the City defendants lacked notice that their manner

41

of administering the ordinance was unlawful.[19] *See Harlow*, 457 U.S. at 819, 102 S. Ct. at 2738 ("[I]f the official pleading the defense claims extraordinary circumstances and can prove that he neither knew or should have known of the relevant legal standard, the defense should be sustained."). *But cf. Mason v. Stallings*, 82 F.3d 1007, 1010 (11th Cir. 1996) (noting, in *dicta*, that where "the law was clear, there would be no 'qualified' immunity").

Qualified immunity is intended to give officials the ability to anticipate when their conduct may give rise to liability for damages. *See Anderson*, 483 U.S. at 645, 107 S. Ct. at 3042. This defense is "separate and distinct form the merits of the case." *Lassiter*, 28 F.3d at 1151.    In fact, "[i]mmunity contemplates exemption from liability that would otherwise exist on the merits." *Id.* Government officials are not charged with the knowledge of legal experts. *Id.* at 1152 n.8. Rather, the court must determine whether the officials were objectively reasonable in their ignorance of the law.

Defendants assert, and it is uncontested, that Christie's application for a permit to picket on public property was the first such application in at least four years.    (City Defendants'

---

[19]    As Christie's constitutional challenge relied on the fact that Mayor Sides and Chief Culpepper were acting within the overly broad scope of authority granted to them, the court has no trouble finding that these defendants were acting within their discretionary authority. Although the council administered the ordinance improperly, the act of administering that ordinance is within the council's discretionary authority.

42

Memorandum Brief in support of Motion for Summary Judgment, Doc. No. 47, ¶ 3 at 14.) Moreover, Christie's appearance at the city council meeting for the purpose of seeking a permit was the first such appearance since Mayor Sides has been Mayor of Cullman. (*Id.*) Also relevant is the lapse of time between the issuance of the two judicial opinions that rendered the law governing administration of this ordinance "clearly established" and the particular application of the ordinance at issue: 27 years. The court cannot pierce the officials' shield of immunity by finding that they knew or should have known of the law governing a rarely invoked ordinance, which was established by judicial construction of a different city's ordinance some 27 years earlier. The City defendants are immune from the § 1983 claims against them in their individual capacities, and their motion for summary judgment on these claims is due to be granted.

### b. State law claims

#### (1) Malicious prosecution

Christie asserts a claim against the City defendants for malicious prosecution. Christie bears the burden of establishing the five elements of a *prima facie* case: (1) the defendant initiated a judicial proceeding; (2) it was initiated without probable cause; (3) it was initiated with malice on the part of defendant; (4) the proceeding was terminated in favor of plaintiff; and (5) plaintiff suffered damage from that earlier action. *Kmart Corp. v. Perdue*,

43

708 So. 2d 106, 108 (Ala. 1997).

Christie fails to establish the proceeding was initiated without probable cause.[20] In *Lynch v. Green Tree Acceptance, Inc.*, 575 So. 2d 1068 (1991), the Supreme Court of Alabama repeated the oft-quoted definition of probable cause for a malicious prosecution action: "Probable cause is defined as '[a] reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.'" 575 So. 2d at 1069 (citations omitted). In a legal action, whether the facts of a case constituted probable cause is a question of law for the court to decide. *Uphaus v. Charter Hospital of Mobile*, 582 So. 2d 1140, 1143 (1991).

As discussed above,[21] the court finds that Christie's picketing beyond the time frame provided in the permit warrants a belief that Christie was guilty of violating § 12-52 of the Cullman City Code. *Cf. Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir.

---

[20] The court also foresees problems for Christie in establishing malice, the third element of his claim. *See Walker v. Windom*, 612 So. 2d 1167, 1169 (Ala. 1992). Malice is defined as "whatever is done willfully and purposely ..., or through mere wantonness or carelessness, if at the same time wrong and unlawful within the knowledge of the actor." *Tuscaloosa Co. v. Henderson*, 699 So. 2d 1274, 1277 n.1 (Ala. Civ. App. 1997). See Part III.B.2.a.(2) for a discussion of defendants' justifiable ignorance of the unlawfulness of their actions.

Moreover, although the defendants do not plead the affirmative defense, *Phillips v. Thomas*, 555 So. 2d 81, 86 (Ala. 1989), the court notes that the City defendants may be immune from Christie's state law claims. *See Couch v. City of Sheffield*, 708 So. 2d 144, 153 (Ala. 1998) (applying Ala. Code § 6-5-338); *Rose v. Town of Jackson's Gap*, 952 F. Supp. 757, 766-67 (M.D. Ala. 1996).

[21] *See* Part III.B.1.b *supra*.

44

1994)(holding police officer immune from liability for making arrest under duly enacted ordinance that was later held unconstitutional) (citing in discussion *Pierson v. Ray*, 386 U.S. 547, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)). Therefore, defendants' motion for summary judgment is due to be granted. *Kmart Corp.*, 708 So. 2d at 110.

### (2) False arrest & imprisonment

Christie also asserts a claim for false arrest and false imprisonment. The essence of Christie's claims is that his arrest for violating the ordinance was unlawful.[22] These claims suffer from the same flaw as the one above: probable cause for the arrest existed.

The same definition for probable cause obtains for these claims. *See Caruth v. Caruth*, 454 So. 2d 539, 540 (Ala. 1984). Where probable cause for an arrest existed, no claim for false arrest or false imprisonment lies, and summary judgment is proper. *Id.; Brooks v. City of Dothan Police Department*, 562 So. 2d 162, 163 (Ala. 1990); *Drill Parts and Service Co. v. Joy Manufacturing Co.*, 619 So. 2d 1280, 1285 (Ala. 1993). Therefore, with respect to these claims, defendants' motion is due to be granted.

### C. Cullman County Defendants' Motion For Summary Judgment

The Cullman County defendants attack the claims Christie

---

[22] Alabama Code § 6-5-170 provides that "[f]alse imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." The Alabama Supreme Court then added that "a wrongful or false arrest will also support a claim for false imprisonment." *Upshaw v. McArdle*, 650 So. 2d 875, 878 (Ala. 1994).

45

asserts against them under 42 U.S.C. § 1983 on three grounds: (1) defendants did not violate Christie's First Amendment rights, because Christie's speech and actions which precipitated the termination of his employment were not protected, and defendants' interest in promoting efficiency of administration outweighs Christie's personal interests in the actions at issue; (2) defendants are entitled to qualified immunity in their individual capacities; and (3) no evidence supports Christie's claim that the Cullman County defendants interfered with his right to protest his termination. (Cullman County Defendants' Summary Judgment Brief, Doc. No. 49, at 1-2.)

Although the parties do not address the issue, for the reasons discussed in Part III.B.2.a.(1) the court finds that Christie's claims against the Cullman County defendants in their official capacities are due to be dismissed. *See McMillian v. Johnson*, 88 F.3d 1573, 1576 n.2 (11th Cir. 1996) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1995)).

### 1. **Whether Christie's speech is protected, and interests are outweighed**

The First Amendment protects freedom of expressive association. *McCabe v. Sharrett*, 12 F.3d 1558, 1562-63 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18, 104 S. Ct. 3244, 3249-50, 82 L. Ed. 2d 18 (1989). This association includes a public employee's right to participate in union activities. *See Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 464-66, 99 S. Ct. 1826, 1827-

46

28, 60 L. Ed. 2d 360 (1979); *United Steelworkers of America v. University of Alabama*, 599 F.2d 56, 61 (5th Cir. 1979). The First Amendment prohibits a public employer's retaliation against a public employee for his protected speech. *Arkansas State Highway Employees*, 441 U.S. at 465, 99 S. Ct. at 1828; *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th 1989). The employee's right, however, is not absolute. *Bryson*, 888 F.2d at 1565. In determining whether a public employer has violated an employee's right to expressive association, the Eleventh Circuit follows the four-part analysis set forth in *Bryson v. City of Waycross*, 888 F.2d 1562 (11th 1989):

> (1) whether the employee's speech involves a matter of public concern; (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service; (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same decision in the absence of the protected conduct.

*Beckwith v. City of Daytona*, 58 F.3d 1554, 1563 (11th Cir. 1995)(citing *Bryson*, 888 F.2d at 155-56). The first two steps present questions of law for the court to decide; the second two present questions of fact for the jury. *Morris v. Crow*, 117 F.3d 449, 456 (11th Cir. 1997).

### a. Whether Christie's speech involved a matter of "public concern"

The first, "public concern" inquiry requires that the court consider "the content, form, and context ... as revealed by the

47

whole record" to determine whether the speech relates to a "matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 147-48, 146, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983). Relevant considerations may include the employee's motivation for the conduct and his attempts to make the concerns public. *Morgan v. Ford,* 6 F.3d 750, 754 (11th Cir. 1993). In effect, the court may consider whether the purpose of the speech was to raise issues of public concern, or to further the employee's own private interest. *Id.*

Defendants contend Christie's speech toward June Haynes was purely private and, therefore, not protected as a matter of public concern. (Cullman County Defendants' Summary Judgment Brief, Doc. No. 49, at 10.) The focus on these comments is misplaced. Christie asserts that "his union activity, and the protests asserted in grievances and remarks critical of the commissioners" were protected by the First Amendment. (Plaintiff's Brief in response to Cullman County's Summary Judgment, Doc. No. 65, at 2-3.) The court agrees that this activity involves a matter of public concern.

In *Morris v. Crow,* the Eleventh Circuit considered whether the speech of plaintiff, an employee of a county sheriff's office, addressed a matter of public concern. Plaintiff sought protection for waiving a campaign sign at a polling place. Considering the content, form, and context, however, the court could not segregate this undoubtedly protected "speech" from the "vituperative outburst

48

expressing her anger that [the sheriff] had fired her husband." 117 F.3d 449, 457 (11th Cir. 1997).[23] Although plaintiff had made other, more threatening and profane comments prior to this outburst, the court, in its analysis regarding "public concern," considered only the statements made contemporaneous to the alleged protected activity. Despite plaintiff's contention that she did not direct these comments to her supervisor and intended no disrespect, the weight of the testimony suggested, and the court concluded, she addressed her supervisor and did so in a "disrespectful, shocking, hostile, embarrassing, and insubordinate manner." *Id.* at 452, 458. Even still, the court was "not entirely sure that [plaintiff's] speech may not be fairly characterized as constituting speech on a matter of public concern." *Id.* at 457 (citations and internal quotation marks omitted).

Christie asserts that "his union activity, and the protests asserted in grievances and remarks critical of the commissioners" were protected by the First Amendment. (Plaintiff's Brief in response to Cullman County's Summary Judgment, Doc. No. 65, at 2-3.) As stated above, the union activity involves protected activity, that is, matters of public concern. The court notes Christie's attempts to make his grievances public in his ill-fated protest

---

[23] The particular outburst at issue consisted of the plaintiff turning to one of her supervisors, pointing her finger at him, and telling him "that she was still on her fucking lunch hour and she had a right to vote and this is the way she was doing it. ... She proceeded to yell and scream and told [her supervisor] that if Sheriff Crow had not fired her husband, that he would be holding a fucking Crow sign also." *Morris*, 117 F.3d at 452.

49

outside the courthouse. Furthermore, actions revealing misconduct in a public office, *Wallace,* 956 F. Supp. 965, as well as actions "bringing to light an 'actual or potential wrongdoing or breach of public trust,'" *Bryson,* 888 F.2d at 1566 (quoting *Morales v. Stierheim,* 848 F.2d 1145, 1149 (11th Cir. 1988), have been found to involve matters of public concern. Christie's "remarks critical of the commissioners" included some that were clearly improper in the workplace,[24] but the remarks were, nonetheless, critical of the manner in which the department was operated.

The court finds Christie's speech related to a matter of public concern. *See Bryson,* 888 F.2d at 1566-67; *see also Rankin v. McPherson,* 483 U.S. 378, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (finding inappropriate or controversial character of statements by public employee irrelevant to whether statements deal with matter of public concern).

### b. Whether Christie's interest in speaking outweighs the county's legitimate interest in efficient public service

The second and last issue for the court in the *Bryson* analysis triggers the "*Pickering* balancing process," where the court weighs "the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it

---

[24] The proper time to inquire into the propriety of the remarks in the workplace and their effect, however, is under the second prong of the *Bryson* test.

50

performs through its employees." *Morris*, 117 F.3d at 457 (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35, 20 L. Ed. 2d 811 (1968)). The court must consider at least three factors: (1) whether the speech at issue impedes the efficient performance of the government's duties; (2) the time, place, and manner of the speech; and (3) the context within which the speech was made. *Bryson*, 888 F.2d at 1567 (citations omitted). Other relevant considerations include whether the speech at issue "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes performance of the speaker's duties or interferes with the regular operation of the [public employer's] enterprise." *Morris*, 117 F.3d at 457-58 (quoting *Rankin*, 483 U.S. at 388, 107 S. Ct. at 2899). The employer bears the burden of convincing the court that its interest is of greater import. *Morales*, 848 F.2d at 1148 n.4.

Defendants again focus on Christie's statements to or about Ms. Haynes, to the exclusion of the speech Christie alleges is protected. (Defendants' summary judgment brief, Doc. No. 49, at 11-15.) Christie, however, does not allege that these comments are protected. (*See* Plaintiff's Brief in response to Cullman County's Summary Judgment, Doc. No. 65, at 2-3.) The Cullman County defendants have made no argument with regard to the speech Christie alleged to be protected.

51

Although the Cullman County defendants did not address the alleged protected speech and Christie asserts only a general description of what speech is protected, the court will address some specific instances in order to avoid further confusion.

First, the court agrees with the county defendants that Christie's interest in making the derisive, irreverent comments to or about Ms. Haynes on September 19, 1996 is outweighed by the county road department's interest in maintaining morale and harmonious relationships among its workers.

Moreover, upon consideration of the factors listed above, the court finds the county's interests also outweigh Christie's in making profane, critical comments directly to his superiors (see Plaintiff's Brief in response to Cullman County Defendants' Summary Judgment, Doc. No. 65, at 6), or threats to his superiors (see Plaintiff's deposition at 129-30). See Bryson, 888 F.2d at 1567; Morris, 117 F.3d at 457-58.

With regard to any other alleged protected speech, defendants have not satisfied their burden under the second prong of the Bryson test. Therefore, for purposes of this motion, the court finds Christie's interests in making the speech relating to a public concern[25] outweigh the defendants' interests as an employer.

---

[25] See the analysis in Part III.C.1.a supra, under the first prong of the Bryson test, for what activity is protected as relating to a public concern. The protected "speech," however, does not include that which the court found outweighed by the county's interest as an employer.

52

**Nota bene:** **The court expects the parties, both prior to pretrial conference and prior to trial, to identify specifically what instances of speech are at issue for purposes of this claim, and to submit via brief and supporting memoranda of law, arguments under each prong of the Bryson test. Concomitantly, the court expects Christie to give Cullman County defendants due notice as to his particular contentions.**

## 2. Whether Cullman County defendants are immune from suit

### a. Cullman County

Although the issue is not "immunity," in the strict sense of that word, the court finds it proper to address here defendants' brief reference to *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), contesting any liability for the county. Under *Monell* and its progeny, a county can be sued directly under § 1983 for monetary, declaratory, or injunctive relief when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body." *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978); *see also Gattis v. Brice*, 136 F.3d 724, 725 n.2 (11th Cir. 1998) (citing *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997) for applying *Monell*'s principles to a suit against a county);

53

*McMillian v. Johnson*, 88 F.3d 1573, 1577-78 (11th Cir. 1996)(discussing county liability under *Monell*). A county also may face § 1983 liability for constitutional deprivations caused by a county "custom," even though the custom is not a formally adopted policy. *Mandel v. Doe,* 888 F.2d 783, 791 (11th Cir. 1989); *see also Monell,* 436 U.S. 690-91, 98 S. Ct. at 2035-36. A county does not, however, face liability under the doctrine of *respondeat superior. Mandel,* 888 F.2d at 791. Furthermore, a § 1983 plaintiff must establish a causal connection between the county's action and the plaintiff's injuries, that is, that the county action was the "moving force of the constitutional violation." *Vineyard v. County of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993) (quoting *Monell,* 436 U.S. at 694, 98 S. Ct. at 2037).

The Cullman County Personnel Handbook leaves no doubt that the county commission possesses final decisionmaking authority over county personnel matters. (*See* Plaintiff's Evidentiary Response to Cullman County's Motion for Summary Judgment, Doc. No. 59, Exhibit 6 at i, 1, 30.) The commission's termination of Christie's employment, even against the recommendation of the personnel board, was, therefore, a "decision officially adopted and promulgated by [the county]." *Monell,* 436 U.S. at 690, 98 S. Ct. at 2036; (*see* Complaint at exhibit 1, 2.) Christie has alleged that this termination was in retaliation for his protected speech and, consequently, was a violation of his First Amendment rights. Thus,

54

Christie has alleged that the county's official action was the "moving force" of his injury. Defendants' motion, in this respect, is due to be denied.

### b. **Whether individual defendants are entitled to qualified immunity in their individual capacities**

As discussed above, the Eleventh Circuit conducts a two-part analysis for claims of qualified immunity under § 1983.[26]  *See Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988). This court already has found that the commission was acting within the scope of its discretionary authority over personnel matters. Consequently, the qualified immunity issue turns on whether Christie can establish that defendants violated clearly established law when they terminated his employment.

The Eleventh Circuit recently addressed a claim of qualified immunity in *Martin v. Baugh*, 141 F.3d 1417 (11th Cir. 1998), which involved a similar § 1983 First Amendment action.  In *Martin*, plaintiff alleged his public employer's disciplinary measures were in retaliation for his protected speech. Discussing the "*Pickering-Connick*" first amendment analysis, the public concern analysis and subsequent balancing test, the court said:

> Because both prongs involve legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules, it is nearly impossible for a reasonable person to predict how a court will weigh the myriad factors. ... Consequently, a defendant in a First

---

[26] *See* Part III.B.2.a.(2) *supra*.

55

Amendment suit will only rarely be on notice that his
actions are unlawful.

*Martin v. Baugh,* 141 F.3d 1417, 1420 (11th Cir. 1998), *reh'g and
reh'g en banc denied,* ___ F.3d ___ (11th Cir. Aug. 7, 1998) (No. 96-
6111). The court went on to discuss the tremendous burden the
plaintiff must carry to defeat an assertion of qualified immunity:

Unless the plaintiff can either produce a case in which
speech materially similar to his in all *Pickering-Connick*
respects was held protected, ... or show that, on the
facts of his case, no reasonable person could believe
that both prongs of the test had not been met, he cannot
defeat a defense of qualified immunity.

*Id.* at 1420 (citation omitted). The court concluded that the
plaintiff failed to satisfy this burden. *Id.* at 1421-22.

Christie has failed to satisfy this court that the law was
"developed in such a concrete and factually defined context" that
these individual defendants should have known their actions were
unconstitutional. *See id.* (citations omitted). Christie offers no
case, nor does the court find one, making it obvious to people in
the positions of these defendants that their actions violated
Christie's First Amendment rights. Furthermore, given Christie's
comments to and about Ms. Haynes, and, his remarks at work to and
about his superiors, Christie alleges no facts that, while viewed
in a light most favorable to him, make it "clear to every reasonable
person" that, in terminating his employment, the Cullman County
defendants violated Christie's First Amendment rights. *See id.* at
421. Thus, Christie has failed to demonstrate the applicable law

was "clearly established" at the time of the termination.

Recognizing that courts should decide qualified immunity issues at the earliest stage possible, *Anderson*, 483 U.S. at 646 n.6, this court finds the individual Cullman County defendants immune from Christie's § 1983 claims against them in their individual capacities. In this respect, defendants' motion is due to be granted.

### 3. Whether Christie offered sufficient evidence that Cullman County defendants interfered with his right to protest

Defendants contend Christie has asserted no "concrete particulars," but that he nevertheless asserts, without supporting arguments or facts, that the Cullman County defendants were involved with his arrest. In response to defendants' motion, Christie has alleged the following sequence of facts: (1) the county commissioners knew the terms of the permit; (2) the city police received complaints shortly after 2:00 p.m., the permit's deadline for picketing, that Christie was violating his permit; (3) the complaints came from the courthouse; (4) the commissioners' offices are in the courthouse; (5) the city police required him to remove the "anti-Tucker" signs from his truck when he was arrested; and (6) when Christie returned, his truck was "festooned with pro-Tucker signs." (Plaintiff's Brief in response to Cullman County's Summary Judgment, Doc. No. 65, at 18-19.) Viewing the evidence in the light most favorable to Christie, the court finds these supporting facts create a reasonable inference that Cullman County defendants were

involved in the arrest.

Defendants further contest liability under § 1983 for any interference with Christie's right to protest. Indeed, the county is not liable for any such first amendment violation, because any interference with Christie's picketing was pursuant to no policy or custom of the county. *See Monell*, 436 U.S. at 690, 98 S. Ct. 2036. The individual defendants in their individual capacities, however, have not satisfied their initial burden of proving they were acting within the scope of their discretionary authority. Thus, they cannot raise successfully a defense of qualified immunity. *See Rich*, 841 F.2d at 1563-64. As to this claim, defendants' motion is due to be denied.

Regretfully, the court finds, as another reason to deny the motion, that it has wandered into a morass of briefs and evidentiary submissions, and has been left without guidance as to what Christie's contentions are, and what the Cullman County defendants' contentions are in response.

**The court, therefore, directs Christie to more clearly, succinctly, and in compliance with Rule 8 of the Federal Rules of Civil Procedure, allege his cause of action against Cullman County defendants for their alleged involvement with his arrest. Defendants shall respond to the allegations in like manner. The parties shall submit appropriate documents to the court prior to pretrial conference.**

58

## IV. CONCLUSION

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this the _15th_ day of September, 1998.

_____
United States District Judge

59